IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs May 16, 2018

**CHARLES GODSPOWER v. STATE OF TENNESSEE**

**Appeal from the Circuit Court for Rutherford County**
**No. F-67377  David M. Bragg, Judge**

_____

**No. M2017-01696-CCA-R3-PC**

_____

The Petitioner, Charles Godspower, appeals the dismissal of his petition for post-conviction relief, arguing that due process considerations should toll the running of the statute of limitations because he timely handed his petition to a prison guard during a period of "lockdown" in the prison. He further argues that his trial counsel were per se ineffective in his defense and that he should have been granted post-conviction funds for a mental evaluation. Following our review, we affirm the dismissal of the petition as time-barred.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which NORMA MCGEE OGLE and ROBERT H. MONTGOMERY, JR., JJ., joined.

Daniel Lyn Graves II, Murfreesboro, Tennessee, for the appellant, Charles Godspower.

Herbert H. Slatery III, Attorney General and Reporter; Ruth Anne Thompson, Senior Counsel; Jennings Hutson Jones, District Attorney General; and J. Paul Newman, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

On November 13, 2012, the Petitioner pled guilty to the second degree murder of Briana Brown, the mother of his child, and the attempted first degree murder of Ms. Brown's mother, Diana Glover. Pursuant to the terms of his negotiated plea agreement, he was sentenced outside his range to concurrent terms of thirty years at 100% for the

second degree murder conviction and thirty-five years at 35% for the attempted first degree murder conviction.

Three days later, the Petitioner filed a motion to withdraw his guilty pleas on the basis that the negotiated plea agreement stated that "he was to receive only one 30-year sentence to be served at 100%[.]" State v. Charles Godspower, No. M2013-00721-CCA-R3-CD, 2014 WL 6091459, at *2 (Tenn. Crim. App. Nov. 14, 2014), perm. app. denied (Tenn. Mar. 12, 2015). Following a hearing, the Petitioner withdrew his motion. He later filed another motion to withdraw his guilty pleas, alleging that his trial counsel "'failed to properly execute the plea according to what we discussed and agreed upon.'" Id. at *3. Once again, however, the Petitioner withdrew the motion. Id.

The Petitioner then filed a motion to reduce his sentences based on ineffective assistance of counsel. The trial court denied the motion, this court affirmed the judgment of the trial court, and our supreme court denied the Petitioner's application for permission to appeal. See id. at *1. Our opinion affirming the trial court's denial of the motion to reduce the sentences provides the following summary of the case:

> In January 2012, the Rutherford County Grand Jury indicted the [Petitioner] for first degree premeditated murder, first degree felony murder, attempted first degree murder, especially aggravated kidnapping, two counts of aggravated assault, and unlawful possession of a weapon. The charges resulted from the shooting of Briana Brown, the mother of his child, and Brown's mother, Diana Glover. On November 9, 2012, the [Petitioner] signed a plea agreement form in which he agreed to plead guilty to second degree murder as a lesser-included offense of first degree felony murder and attempted first degree murder as charged.

> At the [Petitioner]'s November 13, 2012 guilty plea hearing, the State advised the trial court that the [Petitioner] had agreed to plead guilty to second degree murder in exchange for a 30-year sentence, which was "out of range," and that the sentence was to be served at 100%. The State also advised the court that the [Petitioner] had agreed to plead guilty to attempted first degree murder in exchange for a 30-year sentence, which also was "out of range," and that the sentence was to be served at 35%. The sentences were to be served concurrently.

> The State then gave the following factual account of the crimes: The [Petitioner] and Brown became involved in a romantic relationship when Brown was sixteen years old and the [Petitioner] was thirty-two years old. A son was born and was about three years old at the time of the crimes. On

September 15, 2011, the [Petitioner] received a text from Brown, asking for money so that she and their son could go to Holiday World. The [Petitioner] became upset because he thought Brown intended to take their son to Holiday World with another man. The [Petitioner], who was a truck driver, drove from Kentucky to Smyrna, where Brown lived with Glover. On the morning of September 16, 2011, the [Petitioner] texted Brown that he would bring her the money. The [Petitioner] went to the residence and shot Glover in the garage. Brown escaped to her car, but the [Petitioner] fired four shots into the car, hitting Brown twice. After the shootings, the [Petitioner] telephoned 911 and reported that he had shot two people. Brown died at the scene, but Glover survived.

Id.

On June 8, 2016, the Petitioner filed a pro se petition for post-conviction relief in which he raised a number of claims, including ineffective assistance of counsel. Following the appointment of post-conviction counsel, the Petitioner filed an amended petition in which he alleged that his trial and appellate counsel were per se ineffective under the United States v. Cronic, 466 U.S. 648 (1984) standard because under their representation the prosecution's case was not subjected to meaningful adversarial testing. Specifically, he alleged that appellate counsel failed to address whether the Petitioner fully understood his guilty pleas and sentences and whether the trial court committed reversible error by not considering whether the Petitioner was mentally competent to enter his pleas. He alleged that trial counsel was ineffective for, among other things, failing to adequately and sufficiently explain the ramifications of the guilty pleas and the sentences, failing to allow the Petitioner to withdraw his guilty pleas, and failing to request a sufficient mental health examination. The Petitioner additionally alleged that he had new evidence in the form of a recent diagnosis of schizophrenia and suicidal ideation, the symptoms of which "preexisted the events pertinent to this appeal."

The State responded with a motion to dismiss based on the statute of limitations. In his response, the Petitioner asserted that he gave his petition to a prison guard on March 9, 2016, to be delivered to the appropriate notary personnel. The Petitioner attached a notarized statement of a former correctional officer at his prison, Steven Whitmire, who stated that the Petitioner had given him a legal document that needed to be notarized, which Officer Whitmire had left in the office for a week before returning it to the Petitioner.

On May 17, 2017, the Petitioner filed an "Ex Parte Motion for Authorization of Expenses for Mental Health Expert" seeking funds for a forensic psychologist. The Petitioner asserted that

an expert forensic psychologist is necessary for the Court of Criminal Appeals to consider his appeal and opines that without an expert evaluation into the effectiveness and comprehensiveness of the 2012 mental health examination . . . [the Petitioner's] substantive rights will be negatively affected. Specifically, the [Petitioner] has a diagnosis for schizophrenia and . . . this specific issue was not discussed in his very brief mental health examination.

On May 22, 2017, the post-conviction court entered an order denying the motion for authorization of expenses for a forensic psychologist. The post-conviction court noted that the Petitioner's was a non-capital case and that funding for expert witnesses is not only not required under Davis v. State, 912 S.W.2d 689, 695 (Tenn. 1995), but also not authorized in non-capital post-conviction proceedings under Rule 13, Section (5)(a)(2) of the Rules of the Tennessee Supreme Court.

At the July 20, 2017 post-conviction evidentiary hearing, the Petitioner testified that he was represented by his first trial counsel, whom he had retained, for approximately four months before he entered his guilty pleas. During that time, first trial counsel met with him only four times in sessions that lasted only ten to twenty minutes. The Petitioner stated that he wrote first trial counsel letters to which counsel never replied. Two months after he retained first trial counsel, he filed a complaint about him with the Board of Professional Responsibility, which responded by letter that it had warned first trial counsel about his behavior and that first trial counsel should shortly be in touch with the Petitioner. The Petitioner testified that first trial counsel then came to the jail to talk with him, but he did not stay very long. According to the Petitioner, first trial counsel informed him that he had been in the hospital and was not feeling well. Although first trial counsel said he would return to the jail to see him again, he never came back.

The Petitioner testified that he did not initially understand the plea process because it was "[his] first time getting in trouble," and he had never before seen a plea agreement. First trial counsel "explained it a little bit" but did not discuss the details of the plea agreement with him. The Petitioner stated that his understanding was that he would be pleading guilty to two charges in exchange for a thirty-year sentence. During the plea colloquy, however, "there was an additional 30 years at 35 percent[,]" which confused him. He said that at one point during the plea colloquy he told the trial court that he did not understand the plea agreement because he and first trial counsel had not discussed it

in detail. The Petitioner said that the trial court stopped the process and asked first trial counsel if that were true and that first trial counsel answered "yes."[1]

The Petitioner testified that first trial counsel never discussed his mental health, even though he informed him that he had been in a mental hospital in Nigeria when he was ten years old. Later in his testimony, however, the Petitioner acknowledged that first trial counsel arranged for him to meet with a psychologist, who, according to the Petitioner, interviewed him for less than five minutes. The Petitioner said that he was born in Nigeria and came to the United States in 1995. He stated that he had not received any mental health treatment since he had been in the United States because he did not have insurance and could not afford it. The Petitioner said that his mental problems were "in remission" but that they "flare[d] up every now and then" because he was not taking any medication.

The Petitioner testified that after he entered his pleas, he called first trial counsel to ask him why "the additional 30 year sentence was added to the plea agreement." He said that first trial counsel told him he would come to the jail to discuss it with him, but he never showed up. The Petitioner stated that after talking to fellow inmates about how his plea agreement was "not what [he] really wanted," he filed a pro se motion to withdraw his guilty pleas. He said that first trial counsel came to the hearing on the motion to withdraw the guilty pleas and advised him not to do it, telling him that the prosecutor "was going to hang [the Petitioner]" if he withdrew his guilty pleas.

The Petitioner testified that he heeded first trial counsel's advice. However, after talking to more inmates about his unhappiness with the plea agreement, he once again filed a pro se motion to withdraw his pleas. After he filed his second motion, the trial court removed first trial counsel from representation, and second trial counsel took his place. When second trial counsel came to talk to him at the jail, he told her that he wanted to go to trial. Second trial counsel told him she would help him as best as she could. However, when she returned for a second visit, she was not optimistic about his case. According to the Petitioner, second trial counsel informed him that the prosecutor had told her that if the Petitioner withdrew his motion, the State would not "challenge [the Petitioner] if [he] filed a motion for ineffective counsel." The Petitioner testified that

---

[1] The transcript of the plea colloquy reveals that the Petitioner's recollection on this point is not accurate. What actually occurred is that the Petitioner answered "No contest" at the end of the hearing when the time came for him to enter his pleas. The trial court asked trial counsel if he had discussed a nolo contendere plea with the Petitioner, and trial counsel replied that he had not. At that point, the Petitioner said, "Okay. It's guilty."

he heeded second trial counsel's advice and withdrew his motion. He stated that he and second trial counsel never talked about his mental health.

The Petitioner testified that because the prison was on lockdown at the time, he gave his post-conviction petition to prison guard Steven Whitmire, telling him that it needed to be notarized. He said he later signed the petition in front of a notary. The Petitioner stated that Officer Whitmire had since that time left his employment at the prison but had sent a letter stating that he was willing to testify that the Petitioner had given him the petition to be notarized. The Petitioner identified the letter, which was admitted as an exhibit to the hearing. The handwritten and notarized letter states in pertinent part:

> I Correctional Officer Steven Whitmire at TTCC am willing to provide testimony that [the Petitioner] handed me a legal document that needed to be notarized to give to Staff of Notary Personel [sic]. I left those Document [sic] in the office and was reassigned to a Different POD the following day. I did not return to the POD that [the Petitioner] reside/housed to give him his legal document back until a week later.

The Petitioner testified that for the past four years, he had been receiving treatment, consisting of "pills and counseling[,]" for his "mental health disorder[.]" At the time of the entry of his pleas, he was not receiving any medication.

On cross-examination, the Petitioner acknowledged that Officer Whitmire used the word "legal document" rather than petition. He said that he had not yet signed the petition at the time he handed it to Officer Whitmire because he was unfamiliar with the process. He stated that Officer Whitmire gave him back the unsigned petition a week later and that he signed it a few hours later in front of a notary. According to the Petitioner, he put the signed and notarized petition in the mail that same day. The Petitioner acknowledged that the petition was notarized on March 24, 2016, but not file stamped by the clerk's office until June 8, 2016. He insisted, nonetheless, that he put it in the mail on the same day that it was notarized. Upon further cross-examination, the Petitioner testified that he completed the form and handed it to Officer Whitmire on March 12, 2016. He could not recall with certainty whether he signed the form that day or in front of the notary a week later.

The Petitioner acknowledged that he gave a statement to police in which he admitted he shot the victims, although he claimed it was accidental. He conceded he answered the trial court's questions appropriately during the plea colloquy, indicating, among other things, that he understood the plea agreement, that his counsel had reviewed the plea agreement and sentences with him, and that he was entering his guilty pleas

knowingly and voluntarily. He claimed, however, that he was only following first trial counsel's instructions to answer the trial court's questions in the affirmative. The Petitioner further acknowledged that the trial court reviewed with him the sentences at the guilty plea hearing and at each of the hearings on his motions to withdraw his guilty pleas. Finally, he testified that what he really wanted was a reduction in his sentence rather than to withdraw his pleas and proceed to trial.

On redirect examination, the Petitioner testified that the only legal document he ever handed to Officer Whitmire was the petition for post-conviction relief which, to the best of his recollection, he gave to the officer on March 12, 2016. He further testified that he had not had any mental or psychological examinations since the one he received prior to the entry of his pleas.

The Petitioner's second trial counsel, a public defender, testified that she briefly represented the Petitioner beginning in November 2012. She said she met with the Petitioner several times, reviewed the case file, and discussed with the Petitioner his options for withdrawing his pleas. She also repeatedly attempted to speak with first trial counsel but was never able to reach him. Second trial counsel stated that she heard rumors that first trial counsel was ill and ultimately spoke with an attorney in his office. Second trial counsel identified first trial counsel's obituary, which was admitted as an exhibit and reflected that first trial counsel died at the age of thirty-five on January 27, 2013.

Second trial counsel testified that the Petitioner's mental health never came up in their conversations. Second trial counsel stated that when she interviewed the Petitioner at the jail, he was "high-strung, easily agitated, quite confrontational" and that there was a "remarkable difference in him" at the evidentiary hearing, where he appeared "remarkably calm, compared to the person [she] interviewed."

On cross-examination, second trial counsel acknowledged that she was not present during the Petitioner's plea colloquy. She further acknowledged that at the second hearing on the Petitioner's motion to withdraw his pleas, the Petitioner appeared able to control himself before the trial court, even though he was agitated and upset at the hearing. She said she recalled asking the Petitioner if he was comfortable communicating in English and that he responded that he was.

Detective Allan Nabours of the Smyrna Police Department, called as a witness for the State, testified that the Petitioner voluntarily gave a statement to the police after being Mirandized. On cross-examination, he testified that the Petitioner advised them that he was not on any medication at the time he gave this statement. In response to questions by

the post-conviction court, Detective Nabours testified that the Petitioner never made any irrational or off-topic statements and appeared to understand why he was in custody.

At the conclusion of the hearing, the post-conviction court first found that the petition was not timely filed and was therefore barred by the statute of limitations. In the alternative, the court addressed each of the allegations in the petition before concluding that the Petitioner had failed to meet his burden of demonstrating that he was denied the effective assistance of trial counsel or that his guilty pleas were not knowing, intelligent and voluntary. The post-conviction court found that the Petitioner had not put on any proof regarding the effectiveness of appellate counsel. As for the Petitioner's claims of his recent diagnosis of schizophrenia and suicidal ideation, the court noted that the Petitioner presented no proof of this claim other than his own assertions that he had been diagnosed and was receiving medication. On August 1, 2017, the court entered a detailed written order denying the petition based on the above-mentioned grounds.

## ANALYSIS

The Petitioner argues on appeal that his counsel were per se ineffective at the trial court level; that "by denying a current mental evaluation, Tennessee law prevents a Petitioner the ability to conclusively have his mental condition determined"; and that the post-conviction court unduly prejudiced the Petitioner and violated his right to a petition for post-conviction relief by determining that the petition was untimely. The State responds by arguing, among other things, that the post-conviction court properly dismissed the petition as untimely. We agree with the State.

Under the Post-Conviction Procedure Act, a claim for post-conviction relief must be filed "within one (1) year of the date of the final action of the highest state appellate court to which an appeal is taken or, if no appeal is taken, within one (1) year of the date on which the judgment became final, or consideration of the petition shall be barred." Tenn. Code Ann. § 40-30-102(a).

The post-conviction statute contains a specific anti-tolling provision:

The statute of limitations shall not be tolled for any reason, including any tolling or saving provision otherwise available at law or equity. Time is of the essence of the right to file a petition for post-conviction relief or motion to reopen established by this chapter, and the one-year limitations period is an element of the right to file the action and is a condition upon its exercise. Except as specifically provided in subsections (b) and (c), the right to file a petition for post-conviction relief or a motion to reopen under this chapter shall be extinguished upon the expiration of the limitations period.

- 8 -

Id.

Subsection (b) of the statute sets forth the three narrow exceptions under which an untimely petition may be considered, none of which are applicable in this case. Nor are there any due process considerations in this case that would require tolling of the statute of limitations. See Whitehead v. State, 402 S.W.3d 615, 622-23 (Tenn. 2013) (identifying three circumstances under which due process requires tolling of the post-conviction statute of limitations: (1) when a claim for relief arises after the statute of limitations has expired; (2) when a petitioner is prevented by his or her mental incompetence from complying with the statute's deadline; and (3) when attorney misconduct necessitates the tolling of the statute).

The one-year statute of limitations for filing a post-conviction petition in this case expired on March 12, 2016. The post-conviction petition was not filed until June 8, 2016, almost three months past the limitations period. To support his claim that his petition was nonetheless timely, the Petitioner relies on the "mailbox rule" and the fact that his prison was allegedly in "lockdown" at the time he gave his petition to Officer Whitmire to be delivered to the appropriate notary personnel. The "mailbox rule" is found in Rule 49(d)(1) of the Tennessee Rules of Criminal Procedure and provides as follows:

> If a paper required or permitted to be filed pursuant to the rules of criminal procedure is prepared by or on behalf of a pro se litigant incarcerated in a correctional facility and is not received by the court clerk until after the deadline for filing, the filing is timely if the paper was delivered to the appropriate individual at the correctional facility within the time set for filing. This provision also applies to service of papers by such litigants pursuant to the rules of criminal procedure.

Tenn. R. Crim. P. 49(d)(1). Subsection (d)(3) of the rule provides that "[w]hen timeliness of filing or service is an issue, the burden in on the pro se litigant to establish compliance with this provision." Tenn. R. Crim. P. 49(d)(3).

The Petitioner has not met his burden of showing that the mailbox rule applies in his case. He has not provided any proof, other than his own testimony, that he was on lockdown and unable to access the notary personnel at the time he delivered the petition to Officer Whitmire. Moreover, he was ambivalent about when he actually signed the petition and was unable to explain why the petition was not filed with the clerk's office until June 8, 2016, more than two months after he claimed he put it in the mail. Notably, Officer Whitmire states in his affidavit only that the Petitioner gave him a legal document

to be delivered to the notary personnel and that he gave it back to the Petitioner a week later. He does not mention the date on which the Petitioner gave him the document, what the document consisted of, or even that the prison was on lockdown at the time the Petitioner handed him the document. We, therefore, conclude that the post-conviction court properly found that the petition was untimely.

Even if not untimely, the Petitioner would not be entitled to post-conviction relief on the basis of his claims. The Petitioner's own testimony and his responses to the trial court during the plea colloquy reveal that his trial counsel, among other things, met with him on several occasions, reviewed the facts of the case and his possible defenses, and arranged for him to meet with a psychologist. Thus, this is far from a case in which "counsel entirely fail[ed] to subject the prosecution's case to meaningful adversarial testing," leading to a finding of presumed prejudice. Cronic, 466 U.S. at 659. The transcript of the plea colloquy also reveals that the Petitioner answered appropriately when asked if he understood the plea agreement and assured the trial court that he wished to waive his right to trial and enter guilty pleas. The Petitioner presented no prison medical records, statements from prison medical personnel, or anything other than his own testimony that he was receiving "pills and counseling" to support his assertion that he has recently been diagnosed with schizophrenia and suicidal ideation. As for the Petitioner's claim that the post-conviction court should have granted him funds for a current mental evaluation, the Petitioner acknowledges that the rules of our supreme court prohibit the authorization of expert services in non-capital post-conviction proceedings.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the judgment of the post-conviction court dismissing the petition for post-conviction relief as time-barred.

_____
ALAN E. GLENN, JUDGE

- 10 -